## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  19-CR-0066-001-CVE |
| | ) | |
| JULIAN TRUJILLO MORALES, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Now before the Court is defendant Julian Trujillo Morales's motion to suppress evidence (Dkt. # 31). Defendant is charged by indictment with drug conspiracy in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(viii) (count one), and possession of methamphetamine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii) (count two). Dkt. # 23. Defendant moves to suppress approximately four (4) kilograms of methamphetamine recovered by Pryor Police Department (PPD) officers in connection with a traffic stop conducted on March 9, 2019. Plaintiff filed a response in opposition to the motion to suppress (Dkt. # 34), and attached as an exhibit to the response a compact disc (CD) containing officer body-cam footage (Dkt. # 35). A pretrial conference/suppression hearing was held on May 28, 2019, at which PPD Officer Mitchell Phillips testified. See Dkt. # 45. Pursuant to the Court's request during the hearing, the parties filed notices of supplemental authority (Dkt. ## 46, 47).

## I.

Officer Phillips's testimony as to the events of the early morning of March 9, 2019 is summarized below and, where appropriate, is supplemented by reference to the body-cam footage. See Dkt. # 35.

At approximately 1:00 a.m. on Saturday, March 9, 2019, Phillips observed a silver Toyota RAV-4 SUV, with a Texas paper tag, traveling northbound on Route 69 in Pryor, Oklahoma, and operating fog lights in violation of Oklahoma state law. Phillips signaled for the driver of the Toyota to pull over, and proceeded to conduct a traffic stop in the parking lot of a business located at 715 North Mill Street, Pryor, Oklahoma. Phillips was accompanied by Pryor Police Reserve Officer Steven Dill. Phillips approached the Toyota from the passenger side, and asked the driver and passenger for their licenses and proof of insurance. The driver and the passenger provided their licenses to Phillips. The driver of the vehicle was identified as defendant Morales, and the passenger was identified as Victor Ybarra Robles, Jr.[1] Robles looked for the proof of insurance, but he was unable to find it. Phillips suggested that he might be able to find the vehicle's proof of insurance using his cruiser's in-car computer system.

Phillips asked defendant to exit the Toyota. While waiting for defendant to exit the Toyota, Phillips shined a flashlight onto the exterior of the Toyota to see what was in plain view through the windows. Phillips performed a brief pat-down of defendant and then placed him into the passenger seat of the patrol car. Phillips testified that defendant showed signs of nervousness when he first entered the patrol car. Specifically, defendant was breathing heavily and his carotid artery was pulsating rapidly. Phillips testified that motorists are generally nervous to some degree when he stops them, but they are usually not as nervous as defendant seemed to be.

---

[1]    The indictment also names Robles as a defendant. Dkt. # 23. Robles does not join in the motion to suppress, and a warrant was issued for Robles's arrest for failure to appear for pretrial conference. Dkt. # 42. In addition to counts one and two, Robles is charged with possession of cocaine in violation of 21 U.S.C. § 844(a). Dkt. # 23.

Inside the patrol car, Phillips asked defendant where he and his passenger were headed, and defendant responded that they were headed to work. Phillips asked defendant where they work, what they do, and how long they would be there. Defendant explained that they were going to Springfield, Missouri, that they own a company that cleans Walmarts, and that he was "thinking it'll maybe take ten hours" to clean the Walmart in Springfield. Phillips then asked where he and his passenger were coming from, and defendant stated that they were coming from Dallas, Texas.

Phillips then turned the conversation to defendant's criminal history. Phillips asked defendant whether he had ever been in trouble and, if so, for what. Defendant responded that he had been in trouble for "possession" and for "automotive burglary." Phillips asked defendant what he had possessed, and how much of it he had possessed. Defendant responded that he had possessed approximately 116 kilograms of marijuana. Phillips asked defendant where he was arrested for possession, and defendant stated that he was arrested in El Paso, Texas. Phillips asked defendant when he had last crossed the border, and defendant stated that he has not crossed the border.

Approximately four minutes into the traffic stop, Phillips asked defendant for the name of the passenger. Defendant responded, "I just know him by Vic." Phillips asked defendant how long he has known "Vic." Defendant responded that he had started working for him approximately one-and-a-half to two years prior. Phillips asked who owned the Toyota, and defendant responded that he did not know, and that he was just helping to drive.

Phillips testified that, at this point, which was approximately four minutes and thirty seconds into the traffic stop, he had acquired reasonable suspicion of drug trafficking. Further, Phillips testified that, based on his training, once an officer has reasonable suspicion, the officer's options are to ask for consent to search the vehicle or to request a drug detection canine. In response to the

Court's questioning, Phillips testified that he could not request a drug detection canine because there would not have been one available at that time. Moreover, Phillips testified that he did not ask for consent to search at that time, because he had not yet completed the traffic stop. Phillips testified that he wanted to complete the traffic stop, so that he could then address the possible criminal activity.

Phillips asked defendant how big the Walmart in Springfield is, and defendant responded that it was his first time going to Springfield. Phillips asked which Walmarts defendant usually cleans. Defendant explained that "it is regional, so it could be Louisiana, Arkansas, Kansas, New Mexico."

Phillips returned to the topic of defendant's criminal history. Phillips asked, "What else have you been in trouble for?" Defendant responded, "That's it." Phillips asked defendant whether he served time in prison, how much time, and whether he was in state or federal prison. Phillips then asked defendant, once again, for specific details about his possession conviction, such as how many kilograms he had possessed at the time of his arrest, whether he had possessed them in a tractor trailer or car, and whether the crime was related to a drug conspiracy. Phillips then asked whether defendant had anything illegal in the Toyota, and defendant responded that he did not.

Phillips asked defendant how well he knows the passenger, and defendant again stated that they work together. Phillips asked for which company he works, and defendant stated that it is the passenger's company, and that it is called "Victor Robles, Incorporated." Phillips then asked defendant for how long they would be in Springfield, and defendant responded, "Approximately a day, but you never know." Phillips asked defendant how many workers they have, where they were, and what their tasks are. Defendant explained that, other than himself, there are two more people. Approximately nine minutes into the stop, defendant asked Phillips, "So fog lights are illegal here?"

Phillips briefly explained that they are illegal whenever you are in traffic and there is not inclement weather. Phillips then exited the patrol car.

During the entirety of his conversation with defendant, which lasted approximately six minutes (from about minute three to minute nine of the traffic stop), Phillips was simultaneously using his in-car computer system, the Oklahoma Law Enforcement Telecommunication System (OLETS), to run the tag number, to find the vehicle identification number, to determine the name of the vehicle's buyer, and to run defendant's and Robles's drivers licenses. Phillips found that the tag was valid, that the vehicle is registered to Yolanda Robles, and that defendant had a valid driver's license and no warrants. Phillips was not able to pull up the vehicle's insurance information using OLETS.

In response to the Court's questioning, Phillips confirmed that, by the time he exited the patrol car at the end of his conversation with defendant (about minute nine of the stop), he believed his only option with respect to his reasonable suspicion of drug trafficking was to ask for consent to search. As a matter of fact, he did not ask for consent to search until about 32 minutes into the traffic stop.

Approximately nine minutes into the traffic stop, after speaking to defendant in the patrol car, Phillips approached the Toyota to speak to Robles. Phillips asked Robles where they were headed and for what. Robles responded that they were headed to Joplin, Missouri to clean Walmarts. Phillips asked how long they would be there, and Robles responded "until Sunday, maybe before Sunday."

Phillips then asked Robles whether the Toyota is his vehicle, and Robles responded that it is his wife's vehicle. Phillips asked Robles how long they have had the car. Robles responded that

they have had the Toyota for a while, but explained that it was his mother-in-law's car, and that she passed away and so it was transferred into his wife's name.

Phillips then began to ask Robles about his criminal history. Phillips asked Robles whether he had ever been in trouble, and for what. Robles responded that he had been in trouble for dealing drugs. Phillips asked Robles for specific details about his prior drug charges, such as whether he was charged with drug trafficking, with which drugs he was caught, whether it was a conspiracy case, the amount of drugs charged, and whether he served any prison time.

Phillips asked Robles where they were coming from, and Robles responded that they were coming from Dallas. Phillips once again asked Robles how long they would be in Joplin. Robles responded that it depended, but maybe until Sunday. Phillips then asked Robles for details as to what they do, and who owns the company. Robles stated that they strip and wax floors for Walmart and that he owns the company. Phillips asked for the name of the company, and Robles responded that it is "V and Y Cleaning Services." Phillips then asked for the name of the driver of the Toyota, and Robles responded that his name is Julian. Phillips asked Robles how long he has known Julian, and Robles responded that he has known him for about two years. Phillips asked how long Julian has been working for him, and Robles responded about three or four months. Phillips asked Robles how long it takes to clean a Walmart. Robles responded that they would start at around 11 a.m. and finish around 7 or 8 p.m. Phillips then asked Robles how many people work for him and what he does on the job. Robles explained that he has three people who work for him, and that he is the supervisor.

Phillips asked Robles, for a third time, how long they would be in Joplin, and Robles explained that it would depend on what the store asked them to do. Phillips again asked Robles

whether the Toyota is his, and Robles again responded that it is his wife's car. Phillips then asked whether there is anything illegal in the Toyota, and Robles said "no." Phillips testified that when he asked Robles whether there was cocaine in the vehicle, Robles said "no" and then looked up at the sunglass holder on the ceiling of the vehicle.

Phillips then asked Robles about his tattoos. After discussing the tattoos, Phillips asked Robles when the last time was that he was in Mexico. Robles said that he had been in and out of Mexico that past Monday because his wife's uncle had died. Phillips and Robles had a brief conversation about where his family and his wife's family are from in Mexico. Phillips again looked through the windows of the Toyota using his flashlight, and commented that he liked Robles's shirt and that his car was really clean. Phillips then asked Robles how much luggage he had, and Robles responded that he had a couple of bags. Phillips asked if he had anything illegal in his bags, and Robles said "no" and asked Phillips if he wanted to open them. Phillips did not reply to Robles's offer to search the bags, and, instead, asked again whether he had anything illegal in his bags.

Phillips testified that his conversation with Robles, which lasted approximately seven minutes (from minute nine of the traffic stop to about minute 16), had solidified his reasonable suspicion of drug trafficking. Moreover, Phillips testified that, once he finished speaking to Robles, he had planned to write a warning and to ask for consent to search. However, Phillips testified that he did not accept Robles's offer to search the bags at that time, because he had not yet finished the traffic stop–meaning asking defendant some follow-up questions, giving back their licenses, and telling them they are free to go–and the driver was not free to leave.

Approximately 16 minutes into the traffic stop, Phillips returned to his patrol car and questioned defendant for a second time. Phillips once again asked defendant how long he had been

working for Robles, and Morales estimated approximately one-and-a-half years. Phillips then made a phone call to the El Paso Intelligence Center (EPIC). Phillips remained on the phone for approximately 15 minutes, from minute 17 to minute 32 of the traffic stop. During that time, defendant sat in silence in the passenger seat of the patrol car, and Robles remained in the passenger seat of the Toyota. Approximately 26 minutes into the stop, while still on the phone with EPIC, Phillips exited the patrol car to search for a warning book and then reentered the patrol car about two minutes later. During the entirety of the stop, including this 15-minute phone call, Phillips remained in possession of Robles's and defendant's licenses.

At the hearing, the Court asked Phillips why he called EPIC and remained on the phone for 15 minutes instead of giving back the licenses and asking for consent to search the vehicle. Phillips responded that he wanted to check to see if defendant and Robles had made any recent border crossings. Further, when plaintiff's counsel asked Phillips why he made the call to EPIC, Phillips responded that defendant and Robles both admitted to having prior federal arrests, and he knew that EPIC could check their probationary statuses. Phillips testified that the only information he had received from this EPIC call was that Robles had recently crossed the border. However, Phillips confirmed EPIC did not give him any information that he did not already know, because Robles had told him that he had traveled to Mexico that past Monday.

Approximately 32 minutes into the stop, Phillips ended his phone call, returned both licenses to defendant, and stated that he would not be writing him a citation. Defendant asked if he could leave, and Phillips responded, "Yeah. So you say there is nothing illegal in the vehicle. Do you give me consent to search the vehicle?" Defendant responded that it is not his vehicle. Phillips responded that defendant has full control over the vehicle if he drives it. Phillips then asked

defendant whether he would be okay with consent to search the Toyota as long as Robles gave consent to search it. Defendant responded that he would be okay with it, including a search of his own personal luggage. Phillips approached the Toyota and asked Robles, "So you give me consent to search the vehicle?" Robles said "yes." The officers searched the vehicle and found one gram of cocaine in the ceiling sunglasses case, which Robles claimed as his own. The officers also found four vacuum-sealed bags with 4,110 grams of methamphetamine under a spare tire. The officers placed defendant and Robles under arrest.

The Court finds that Officer Phillips's testimony is credible.

## II.

Defendant moves to suppress the 4,110 grams of methamphetamine seized, arguing that Officer Phillips impermissibly extended the traffic stop, and any evidence seized after the initial purpose of the traffic stop was completed should be suppressed. Defendant Morales has standing under the Fourth Amendment to challenge the validity of the traffic stop. Brendlin v. California, 551 U.S. 249 (2007); United States v. White, 584 F.3d 935, 945 (10th Cir. 2009).

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures." U.S. CONST. amend. IV. Its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. United States v. Arvizu, 534 U.S. 266, 273 (2002). A traffic stop is treated as an investigative detention, and is examined under the principles set forth in Terry v. Ohio, 392 U.S. 1 (1968). United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005). Terry requires the Court to make two separate inquiries when determining the reasonableness of a traffic stop.

## A.  First Prong of <u>Terry</u>

The first inquiry under <u>Terry</u> is whether the traffic stop was justified at its inception.  <u>United States v. Botero-Ospina</u>, 71 F.3d 783, 787 (10th Cir. 1995).  "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." <u>Id.</u>  Here, it is undisputed that Phillips stopped the Toyota because he had observed an improper operation of fog lights in violation of OKLA. STAT. tit. 47, § 12-217.  Therefore, the Court finds that the traffic stop was justified at its inception, and the first prong of <u>Terry</u> is satisfied.  <u>See</u> Dkt. # 31, at 7 ("It appears that the traffic stop was justified at its inception.").

## B.  Second Prong of <u>Terry</u>

The second inquiry under <u>Terry</u> is whether the officer's conduct during the detention was reasonably related in scope to the circumstances which justified the initial stop.  <u>Terry</u>, 392 U.S. at 20.  "The investigative detention usually must last no longer than is necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification."  <u>United States v. Hunnicutt</u>, 135 F.3d 1345, 1349 (10th Cir. 1998) (internal quotation marks omitted).  After the purpose of the traffic stop is completed, further detention for purposes of questioning unrelated to the initial traffic stop is permissible if, during the initial stop, the detaining officer acquired reasonable suspicion that illegal activity has occurred or is occurring.  <u>United States v. Clarkson</u>, 551 F.3d 1196, 1201 (10th Cir. 2009).  The Court first considers the extent to which the seizure was reasonably related in scope to the traffic violation.

The first nine minutes of the traffic stop involved Phillips asking for driver licenses and proof of insurance, conducting computer checks, and questioning defendant.  "Beyond determining

whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop." Rodriguez v. United States, 135 S. Ct. 1609, 1615 (2015) (quoting Illinois v. Caballes, 543 U.S. 405, 408 (2005)). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. These checks are within the scope of the traffic stop because they serve the purpose of ensuring that vehicles on the road are operated safely and responsibly. Id. Here, it was within the scope of the traffic stop for Phillips to ask for defendant's and Robles's driver licenses and proof of insurance, and to use OLETS to run the vehicle's tag, check the driver licenses, search for warrants, and find the name of the vehicle's owner. Therefore, the Court finds it was reasonable for Phillips to seize defendant while conducting OLETS checks and questioning defendant.

Defendant argues, however, that during this initial conversation, Phillips asked him questions that were unrelated to the traffic stop, such as questions relating to his travel plans and criminal history. It is well settled that, while taking actions that are within the scope of the traffic stop, "an officer may ask questions, whether or not related to the purpose of a traffic stop, if they do not excessively prolong the stop." United States v. Simpson, 609 F.3d 1140, 1146 n.1 (10th Cir. 2010); see United States v. Cone, 868 F.3d 1150, 1154 (10th Cir. 2017) (permitting questions regarding the driver's criminal history); Bradford, 423 F.3d at 1156 (permitting questions regarding travel plans). Here, Phillips was running computers checks through OLETS–a task that is related to the traffic stop–during the entirety of his initial questioning of defendant, including when he asked defendant about his travel plans, criminal history, and relationship to Robles. Accordingly, the Court finds that all questions asked by Phillips during his initial conversation with defendant were permissible,

because they were either reasonably related to the traffic stop, or they were asked while Phillips was conducting tasks reasonably related to the traffic stop and thus did not prolong the stop.

Phillips testified that, by the end of his conversation with defendant, he had not yet completed the traffic stop because he still needed to confirm ownership of the vehicle. To confirm ownership, Phillips spoke to Robles. Confirming ownership of the vehicle "serve[s] the purpose of ensuring that vehicles on the road are operated safely and responsibly." Rodriguez, 135 S. Ct. at 1615. Therefore, the Court finds that Phillips's conversation with Robles regarding ownership of the vehicle was reasonably related to the traffic stop, and it was reasonable to detain defendant.

Within approximately one minute of speaking to Robles (and approximately ten minutes into the traffic stop), Phillips confirmed that the vehicle was owned by Robles's wife. "[A] driver must be permitted to proceed after a routine traffic stop if a license and registration check reveal no reason to detain the driver unless the officer has reasonable articulable suspicion of other crimes . . . ." United States v. Chavira, 467 F.3d 1286, 1290 (10th Cir. 2006) (quotations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are–or reasonably should have been completed." Rodriguez, 135 S. Ct. at 1614. Here, Phillips's authority to seize defendant based on the traffic violation ended shortly after he confirmed ownership of the vehicle, at which point all tasks tied to the traffic infraction reasonably should have been completed. However, Phillips continued to detain defendant for approximately 22 minutes after confirming ownership of the vehicle. In order for the continued detention to be lawful, Phillips was required to have obtained reasonable suspicion of criminal activity prior to confirming ownership of the vehicle.

**C. Continued Detention Based on Reasonable Suspicion**

The Court turns to whether Phillips had acquired reasonable suspicion during the initial stop (i.e., within the first ten minutes of the traffic stop) as to justify the continued detention. Moreover, "[w]hen the stop is extended based on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary, lasting no longer than necessary to effectuate the purpose of the [further detention], and the scope of the [further] detention must be carefully tailored to its underlying justification.'" United States v. Wilson, 90 Fed. App'x 640, 644 (10th Cir. 2004)[2] (quoting United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997)). Thus, to the extent the Court finds that there was reasonable suspicion to justify the continued detention, the Court also considers whether the further detention lasted no longer than was necessary to effectuate its purpose and whether the scope of the further detention was carefully tailored to its underlying justification.

1. Reasonable Suspicion

Phillips testified that he had acquired reasonable suspicion of drug trafficking prior to speaking to Robles–specifically, within four minutes and thirty seconds of the traffic stop. Reasonable suspicion "represents a minimum level of objective justification which is considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Alcaraz-Arellano, 441 F.3d 1252, 1260 (10th Cir. 2006) (quoting United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997)). However, an "inchoate and unparticularized suspicion or 'hunch' is insufficient" to support reasonable suspicion. United States v. Hall, 978 F.2d 616, 620 (10th Cir. 1992) (internal quotations and citations omitted). In determining whether an officer acquires

---

[2]  This and other cited unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

reasonable suspicion of other criminal activity during a traffic stop, the Court does not evaluate the facts in isolation but instead construes them together based on the totality of the circumstances. Arvizu, 534 U.S. at 274.

Plaintiff argues that Phillips was confronted with numerous factors creating reasonable suspicion within the first few minutes of the traffic stop. First, Phillips testified that defendant's nervousness contributed to his reasonable suspicion analysis. The Tenth Circuit has consistently held that "in the usual course, 'nervousness is of limited significance in determining reasonable suspicion' because 'it is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity.'" United States v. Pettit, 785 F.3d 1374, 1380 (10th Cir. 2015) (quoting United States v. Salzano, 158 F.3d 1107, 1113 (10th Cir. 1998)). "Ordinary nervousness alone cannot serve as the basis for reasonable suspicion. [The Court] look[s] only for signs of nervousness 'beyond those normally anticipated during a citizen-police encounter.'" Id. (quoting Salzano, 158 F.3d at 1113) (internal citations omitted). "Further, [the Court] require[s] 'specific indicia that the defendant's nervousness was extreme' and will not given credit to 'an officer's naked assertion.'" Id. (quoting Simpson, 609 F.3d at 1148)). Here, Phillips described specific indicia of nervousness–that defendant was "breathing heavily and the carotid artery in his neck was pulsating rapidly." Dkt. # 34, at 11. Moreover, Phillips testified that, although motorists are generally nervous when he stops them, they are usually not as nervous as defendant seemed to be. Therefore, Phillips testified that defendant's signs of nervousness were abnormal. The Court finds that, although nervousness is entitled to very limited weight, it is nonetheless a relevant factor in the totality of the circumstances analysis.

Second, Phillips testified that defendant's vague and internally inconsistent answers contributed to his reasonable suspicion analysis. Plaintiff argues that defendant was vague in "saying that cleaning the Wal-mart in Springfield would take ten hours, or maybe more, saying that he could not describe how big the Wal-mart was because this was actually his first time going to this Wal-mart, and saying that he knew 'Vic' for a year and a half, or two years, or maybe more." Dkt. # 34, at 10. The Tenth Circuit has held that vague responses to an officer's inquiries can contribute to a trained and experienced officer's reasonable suspicion. United States v. McRae, 81 F.3d 1528, 1535 (10th Cir. 1996). Phillips testified that, based on his experience and training, vague responses often indicate that a motorist is trying to avoid giving specific answers that can more easily be discovered as false. Further, plaintiff argues that defendant gave internally inconsistent responses to Phillips regarding how well he knows Robles. For example, although defendant stated that he and the passenger had worked together for about one-and-a-half to two years, defendant told Phillips that he only knew the passenger as "Vic." A few minutes later, defendant contradicted himself again regarding his knowledge of the passenger's name when he informed Phillips that the company for which he works is "Victor Robles, Incorporated." Moreover, defendant initially told Phillips that both he and the passenger owned the company, but he later stated that it is the passenger's company. The Tenth Circuit has recognized that an individual's internally inconsistent statements is a factor that may contribute to an officer's reasonable suspicion of illegal activity. United States v. Davis, 636 F.3d 1281, 1291 (10th Cir. 2011). The Court finds that defendant's vague and internally inconsistent answers to Phillips's questions weighs in favor of finding reasonable suspicion.

Next, Phillips testified that defendant's criminal history contributed to his reasonable suspicion. Defendant admitted to Phillips that he had previously been convicted for participating

15

in a large-scale drug trafficking conspiracy.  The Tenth Circuit has held that, "in conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus."  United States v. Santos, 403 F.3d 1120, 1132 (10th Cir. 2005).  Accordingly, the Court finds that defendant's prior conviction for drug trafficking conspiracy weighs heavily in favor of finding that Phillips had reasonable suspicion.

Phillips also testified that defendant's statement that he was in El Paso when he was arrested for drug trafficking contributed to his reasonable suspicion.  Phillips testified that this fact was significant because El Paso is on the border of Mexico, a common source for illegal narcotics trafficking.  As support, plaintiff cites United State v. White, 584 F.3d 935 (10th Cir. 2009).  In White, the officer testified that, at the time of the stop, the defendants "were travelling from Las Vegas, 'a well-known distribution point for . . . large amounts of drugs,' to Indianapolis, 'a well-known destination point.'"  Id. at 951.  Here, however, defendant informed Phillips that he was traveling from Dallas, Texas to Springfield, Missouri; there is no allegation or reason to believe that defendant was traveling to or from El Paso at the time he was stopped.  Further, even if defendant had stated that he was traveling from El Paso when he was stopped, such a fact would be "at best, a weak factor in finding suspicion of criminal activity."  Id. at 951-52 (quoting Williams, 271 F.3d at 1207).  Accordingly, the Court finds that defendant's statement that he was in El Paso when he was previously arrested for drug trafficking contributes no weight to the reasonable suspicion analysis.

Phillips testified that defendant's statement that he was coming from Dallas was significant to his reasonable suspicion analysis, because Dallas is a big city and does not arouse the same suspicion that cities further south would; therefore, drug traffickers driving north will often say they

are coming from Dallas. Dkt. # 34, at 11. In <u>White</u>, the Tenth Circuit held that "the probativeness of a particular defendant's route is minimal." <u>White</u>, 584 F.3d at 952. As the Tenth Circuit explained in <u>Santos</u>, "[i]f travel between two of this country's largest population centers is a ground on which reasonable suspicion may be predicated, it is difficult to imagine an activity incapable of justifying police suspicion and an accompanying investigative detention." <u>Santos</u>, 403 F.3d at 1132. The mere fact that defendant was traveling from Dallas does not contribute any weight to the reasonable suspicion analysis–especially in light of the fact that defendant's and Robles's licenses list addresses in Dallas. <u>See</u> Dkt. # 35, at 19:09. Accordingly, the Court finds that the fact that defendant told Phillips he was traveling from Dallas contributes no weight to the reasonable suspicion analysis.

Based on the totality of the circumstances–specifically, defendant's extreme nervousness, his prior conviction for drug trafficking, and his vague and internally inconsistent responses–the Court finds that Phillips had reasonable suspicion that criminal activity was afoot within four-and-a-half minutes of conducting the traffic stop, and certainly by the end of his initial conversation with defendant. Therefore, Phillips had reasonable suspicion to continue to detain defendant after the purposes of the traffic stop reasonably should have been completed.

### 2. Length and Scope of Continued Detention

Although Phillips had reasonable suspicion to continue the detention after the purposes of the traffic stop reasonably should have been completed, the Court must also determine whether the further detention was reasonable in terms of length and scope, including "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions

quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 676 (1985).

### a. Continued Questioning of Robles

The Tenth Circuit has recognized that an officer who has acquired reasonable suspicion of criminal activity during an initial traffic stop may continue the stop for a "short time" in order to question the passenger of the vehicle. United States v. Marquez-Diaz, 325 Fed. App'x 637, 645 (2009). Here, Phillips continued to question Robles for approximately six minutes after confirming ownership of the vehicle. The Court finds that, because Phillips had already acquired reasonable suspicion prior to confirming ownership of the vehicle, he was permitted to continue the stop for a "short time" in order to question Robles.

Moreover, the Court finds that the length and scope of Phillips's continued questioning of Robles was reasonable. Robles contradicted defendant at the outset of his conversation with Phillips, stating that they men were traveling to Joplin. Defendant had informed Phillips that they were traveling to Springfield. As their conversation continued, Phillips asked Robles several of the same questions he had asked defendant, and Robles's answers continued to contradict defendant's answers (e.g., the name of the cleaning company, and the length of time that defendant had been working for Robles). Phillips also learned of Robles's drug-related criminal history, and he observed Robles look at the sunglass holder when Phillips asked him whether there was any cocaine in the vehicle. Accordingly, during Phillips's conversation with Robles, "[c]ascading events" added to Phillips's already-existing reasonable suspicion of drug trafficking. Marquez-Diaz, 325 Fed. App'x at 645; see United States v. Karam, 496 F.3d 1157, 1164-65 (10th Cir. 2007) (contradictory statements). Therefore, the Court finds that Phillips's questioning of Robles was reasonably related to the purpose

of confirming or dispelling Phillips's suspicions of drug trafficking, and that six minutes is not an unreasonable length of time within which to conduct such questioning.

### b. EPIC Phone Call

By the end of his conversation with Robles, approximately sixteen minutes into the traffic stop, Phillips had acquired heightened reasonable suspicion of drug trafficking. As discussed, Phillips believed that his only option with respect to his reasonable suspicion was to ask for consent to search the vehicle. Therefore, once his conversation with Robles ended, Phillips concluded that he was going to ask for consent to search for the vehicle. Phillips testified, however, that he first wanted to finish up the traffic stop by asking defendant a couple of follow-up questions, issuing a warning, return the licenses, and informing the men that they were free to go before asking for consent to search. Phillips's testimony as to what he planned to do does not align with what he actually did. Although he returned to his patrol car and asked defendant follow-up questions for about 20 seconds, Philips did not then issue a warning, return the licenses, tell the men that they were free to go, or ask for consent to search the vehicle. Instead, Phillips made a phone call to EPIC.

The Court finds that to fully appreciate the unreasonable delay of this traffic stop caused by this phone call, one must watch the fifteen minute segment comprising the EPIC phone call. Dkt. # 35, at 17:30-32:09. This phone call lasted for 15 minutes of the 32 minute detention, during which time defendant sat in silence in the passenger seat of the patrol car. Phillips did not speak to defendant either; aside from making a few statements to the EPIC officer, Phillips remained silent for the majority of the phone call. Approximately ten minutes into the phone call, Phillips briefly exited the patrol car to search for his warning book. Aside from briefly looking for his warning book, Phillips was not conducting any other tasks while on the phone with EPIC.

The Court asked Phillips why he called EPIC instead of finishing the traffic stop and asking for consent to search the vehicle, as he had planned. Phillips testified that his reason for calling EPIC was to look up defendant's and Robles's border crossing information and probationary statuses. However, Phillips failed to explain why it was necessary to detain defendant in order to obtain that information; Phillips also failed to explain the impact that information would have on his suspicions. This case is unlike a case involving a delay caused by a drug detection canine. In the context of a drug detection canine, it is necessary to detain the individual for a period of time while waiting for the canine to arrive, so that the officer can then conduct a task that will quickly confirm or dispel his reasonable suspicion. Here, with respect to border crossings, Phillips already knew that Robles had crossed the border that past Monday, because Robles had informed him of this during their conversation. When an officer already has information about an individual's recent border crossing, it is unnecessary and unreasonable to continue the detention for 15 minutes in order to confirm that the individual had recently crossed the border. Even if Phillips had learned additional information regarding border crossings, such information would have neither dispelled nor confirmed his heightened reasonable suspicion of drug trafficking. Further, with respect to probation violations, Phillips had already run an OLETS check within the first few minutes of the traffic stop, and had confirmed that defendant and Robles did not have any outstanding warrants. To the extent Phillips believes that OLETS provides inaccurate or incomplete warrant information, Phillips could have run the EPIC check at any point during which he was conducting tasks that were reasonably related to the traffic violation. Instead, Phillips waited until seventeen minutes into the traffic stop–after he had already determined that he was going to write a warning–to run an EPIC check. In this context, Phillips's actions were more akin to those of a detective conducting a full-blown

criminal investigation, than those of an officer conducting a brief investigative stop. The Court finds

that Phillips's explanations as to why he needed to conduct an EPIC check are insufficient to show

that the 15 minute prolonged detention was both necessary and carefully tailored to the purpose of

the underlying further detention.[3]

Accordingly, the Court finds that defendant's motion to suppress should be granted.

**IT IS THEREFORE ORDERED** that defendant Julian Trujillo Morales's motion to

suppress evidence (Dkt. # 31) is **granted**.

**DATED** this 4th day of June, 2019.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

---

[3]     Plaintiff argues that the Tenth Circuit's unpublished opinion in United States v. Marquez-
Diaz, 325 Fed. App'x 637 (2009), compels a finding that the EPIC check did not
unreasonably extend the detention. In Marquez-Diaz, however, the officer requested that
dispatch conduct the EPIC check while the officer continued to perform actions that were
reasonably related to the further detention, such as questioning the defendant about the
inconsistencies between his statements and his passenger's statements. Moreover, while
dispatch was conducting the EPIC check, the officer returned the licenses to the defendant,
issued a warning ticket, and received the defendant's consent to search the vehicle.
Accordingly, the EPIC check in no way delayed the detention. Here, the EPIC check did, in
fact, delay the detention. For 15 minutes, the EPIC check was the sole task Phillips was
performing. Even though Phillips searched for his warning book during the phone call, he
did not begin to look for it until ten minutes into the phone call. Further, after he failed to
find the warning book, he did not then inform defendant that he would not be issuing a
warning. Rather, he waited until he finished his phone call to return both licenses to
defendant and to ask for consent to search. Therefore, the Court finds that Marquez-Diaz is
inapposite.